# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## APPEAL NO. 23-12772

---

MARK GARDNER, LONNIE HOOD, AND IVORY STREETER
*Plaintiffs-Appellants,*

v.

KEISHA LANCE BOTTOMS, PAUL HOWARD, GREG L. THOMAS, ERICA
SHIELDS, AND FULTON COUNTY GOVERNMENT
*Defendants-Appellees.*

---

## APPELLANT'S PRINCIPAL BRIEF

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

---

LANCE J. LORUSSO, ESQ.
KEN DAVIS, ESQ.
LORUSSO LAW FIRM, P.C.
1827 POWERS FERRY ROAD SE
BUILDING 8
ATLANTA, GEORGIA 30339

*Attorneys for Appellants Mark Gardner, Lonnie Hood, and Ivory Streeter*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Bottoms, Keisha L., *Defendant in her Individual Capacity*

Bowman, Brad, *Counsel for the Fulton County Government*

Davis, Ken, *Counsel for Defendant*

Friduss, Phillip E., *Counsel for Keisha L. Bottoms*

Fulton County Government, *Defendant*

Gardner, Mark, *Plaintiff*

Green, Noah, *Counsel for Paul Howard*

Henefeld, Paul, *Counsel for Paul Howard*

Hood, Lonnie, *Plaintiff*

Howard, Paul, *Defendant in his Individual and Official Capacity*

Kinsley, Nicholas A., *Counsel for Erika Sheilds*

LoRusso, Lance J., *Counsel for Plaintiffs*

McGovern, Annarita L, *Counsel for Greg Thomas*

Shields, Erika, *Defendant*

Sleeper, Juliana Y., *Counsel for Fulton County Government*

Streeter, Ivory, *Plaintiff*

Thomas, Greg L., *Defendant in his Individual and Official Capacity*

Ware, Robert D., *Counsel for Keisha L. Bottoms and Erika Shields*

Yarbrough, Walter B., *Counsel for Greg L. Thomas*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The instant appeal involves novel issues rarely litigated in any forum. It arises from publicly broadcast chaos seen worldwide in real time. However, the injuries suffered by Officers on the front line of the worst riotous destruction in modern City of Atlanta history continued long after news cameras ceased filming and pundits stopped speaking. These Appellants represent the class of plaintiffs discarded in the name of politics, and they deserve the right to pursue discovery and redress the unimaginable indignities they suffered at the hands of ego and opportunity-driven officials who now claim immunity. The legal questions raised in this appeal are critical not only to these plaintiffs, but to all law enforcement officers and other public officials who may be made pawns of those in power for their own political purposes. This Court should hear oral argument as the instant appeal involves nuanced interpretation of a rarely litigated body of law that carries important public policy implications and lends itself to in person argument.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS......................................................C-1

STATEMENT REGARDING ORAL ARGUMENT..................................................i

TABLE OF AUTHORITIES......................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE CASE................................................................3

A.  General Background and Structure of Action .................................3

B.  Relevant Procedural Background...................................................6

C.  Facts Pleaded ..............................................................................6

　　1. Reasonableness of Officers actions ...................................6

　　2. Non-Prosecutorial nature of actions ..............................7

　　3. County-Capacity Allegations...........................................8

　　4. Monell Allegations.........................................................8

　　5. Deprivation of Liberty Interests and Stigma Suffered ...........9

　　6. Additional Relevant Facts ..............................................9

D.  The Lower Court's Order Dismissing All Counts............................10

STANDARD OF REVIEW ..................................................................12

SUMMARY OF THE ARGUMENT ........................................................13

ARGUMENT ...................................................................................16

**I.  THE TRIAL COURT ERRED IN IGNORING THE SUPREME COURT'S HOLDING IN *BUCKLEY*. ......................................16**

**A. The Central Holding in *Buckley* Delineates Prosecutorial and Investigative Functions Under a Temporal Framework. ..................16**

**B. This Court Must Reverse for the Lower Court to Properly Apply Binding Law. ..............................................................................21**

**II.  THE TRIAL COURT ERRED IN APPLYING AN INCORRECT STANDARD TO 12(b)(6) MOTIONS TO DISMISS. ..............................21**

**III. THE COURT FAILED TO ADDRESS FAVORABLE FACTUAL ALLEGATIONS ESTABLISHING ACTUAL MALICE IN THE NEW YORK TIMES SENSE AND FAILED TO ADDRESS MALICE IN ITS NORMAL USAGE...................................................................26**

**IV. THE COURT FAILED TO ADDRESS ADDITIONAL LIBERTY INTERESTS PLEADED WITHIN OFFICERS COMPLAINT WHICH ADDRESSED A SECOND PLUS FACTOR. ...............................................29**

**V. APPELLEES LIKEWISE ADDRESS AN ERRONEOUS THEORY OF LIABILITY ON THE STIGMA PLUS FAILING TO ADDRESS THE OTHER PLUS ......................................................................................30**

**VI. THE COURT ERRED IN DETERMINING AN ADEQUATE NAME-CLEARING HEARING OCCURRED.........................................32**

**VII. THE TRIAL COURT MISAPPLIED THE HOLDING OF *CAPTAIN JACK'S CRABSHACK, INC. V. COOKE, 2022 WL 4375364 (2022)*....................................................................................................37**

**VIII. THE LOWERCOURT UTILIZED ERRONEOUS CONCLUSIONS IN DETERMINING THAT HOWARD COULD NOT HAVE BEEN A FINAL POLICY MAKER FOR THE COUNTY.........39**

**IX. THE LOWER COURT IMPROPERLY RELIED ON INAPPOSITE CASELAW TO DETERMINE THAT OFFICERS FAILED TO PLEAD AN EQUAL PROTECTION CLAIM........................................................40**

CONCLUSION ...............................................................................................45

CERTIFICATE OF COMPLIANCE ........................................................46

CERTIFICATE OF SERVICE ..................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ passim

*Bah v. Little*, No. 1:13-cv-2571-WSD, 2014 WL 4230095, at *4 (N.D. Ga. Aug. 26, 2014) ....................................................................................................................40

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ......................... 21, 23, 25, 37

*Brooks v. George Cnty., Miss.*, 84 F.3d 157, 165 (5th Cir. 1996) ..........................36

Brown v. Zavaras, 63 F.3d 967, 971 (10th Cir. 1995) ............................................43

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), ................................................ passim

*Captain Jack's Crabshack, Inc. V. Cooke, 2022 WL 4375364 (2022)* .......... 2, 37, 39

Cisneros v. Petland, Inc., 972 F.3d 1204, 1210 (11th Cir. 2020) ............................12

*Codd v. Velger*, 429 U.S. 624, 627 (1977) ..............................................................30

*Conley v. Gibson*, 355 U.S. 41, 47 (1957) ..............................................................21

*Daley v. Clark*, 638 S.E.2d 386 ....................................................................... 27, 28

*Daniels v. Williams*, 474 U.S. 327 (1986) ..............................................................34

*De Libellis Famosis*, 3 Co. Rep. 254, 255, pt. v, fol. 125, 77 Eng. Rep. 250, 251 (1605) ..................................................................................................................33

*Doe v. Samford Univ*., 29 F.4th 675, 695 (11th Cir. 2022) .....................................23

*Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir.1980) ..............................35

*Ganasekera v. Irwin*, 551 F.3d 461, 470-71 (6th Cir. 2009*)* ........................... 31, 34

Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) ............................................................................26

Greene v. McElroy, 360 U.S. 474, 493, n. 22, 79 S.Ct. 1400, 1411, 3 L.E2d 1377 (1959) ...................................................................................................33

Harte–Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 666, n. 7, 109 S.Ct. 2678, 2685, n. 7, 105 L.Ed.2d 562 (1989)......................................27

*Hatcher v. Miller (In re Red Carpet Corp.)*, 902 F.2d 883, 890 (11th Cir.1990) ....21

Haves v. City of Miami, 52 F.3d 918, 921–22 (11th Cir.1995) ...............................42

*Hudson v. Palmer*, 468 U.S. 517, 532 (1984)................................................... 35, 36

*Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1581 (11th Cir 1986) ...............................................................................................................40

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) ..............37

*Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)..........33

Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 140-141, 71 S.Ct. (624), at 632 (95 L.Ed. 817) ......................................................33

*Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1333 (11th Cir.2004)...........13

*Logan v. Zimmerman Brush*, Co., 455 U.S. 422 (1982) ..........................................35

*Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980) .......................................30

*Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991) ........................... 26, 27

*Mathews v. Edridge*, 424 U.S. 319, 334 (1976)......................................................31

*McKinney v. Pate*, 20 F.3d 1550, 1557 (1 1th Cir. 1994) ......................................30

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658,

   (1978)....................................................................................................... passim

Neitzke v. Williams, 490 U.S. 319, 327 (1989) ......................................................24

*New York Times v. Sullivan*, 376 U.S. 254 (1964). .............................. 15, 26, 27, 29

*Parrat v. Taylor*, 451 U.S. 527, 536-39 (1981)................................................. 34, 36

*Paul v. Davis,* 424 U.S. 693, at 725, 726 (1976) ....................................................33

*Phillips v. City of Atlanta*, No. 1:15-cv-3616-TWT-RGV, 2016 WL 5429668, at *8

   (N.D. Ga. July 29, 2016).....................................................................................40

*Rieves v. Town of Smyrna*, 959 F.3d 678 (6th Cir. 2020) ........................................37

*Secretary of Labor v. Labbe*, 319 Fed. Appx. 761, 763 (11th Cir. 2008) ...............23

*Smile Direct Club, LLC*, No. 2023 WL 2763662......................................................44

Stevens v. Plumbers & Pipefitters Local 219, 835 Fed. Appx. 499, 501 (11th Cir.

   2020) ..................................................................................................................12

*Swanson v. Citibank N.A.,* 614 F.3d 400 (7th Cir. 2010) .........................................23

*Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007).........................23

*Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) .................................... 35, 36

**Statutes**

28 U.S.C.A. § 1291 .................................................................................................9

28 U.S.C.A. § 1331 ...................................................................9

28 U.S.C.A. § 1343 ..................................................................9

28 U.S.C.A. § 1367 ...................................................................9

42 U.S.C.A. § 1983 ...................................................................9

## Other Authorities

Katie Rose Guest Pryal, *Heller's  Scapegoats*, 93 N.C. L. Rev. 1439 (2015) .........47

Joseph E. Kennedy, *Monstrous Offenders and the Search for Solidarity through*

   *Modern Punishment*, 51 Hastings L.J. 829, 833 (2000) .......................................47

Paul Kahn, *Managing  Violence: Acoustic Separation, Memorials, and*

   *Scapeogoats*, 77 RJUPR 317 (2008) ..................................................47

## Rules

Fed. R. Civ. P. 8..........................................................................28, 32

Fed. R. Civ. P. 12(6)(b) .........................................................31, 32, 41, 48

Fed. R. App. P. 32(a)(5) ...........................................................51

Fed. R. App. P. 32(a)(6) ...........................................................51

Fed. R. App. P. 32(a)(7)(B) .......................................................51

Fed. R. App. P. 32(g)..............................................................51

## JURISDICTIONAL STATEMENT

Plaintiff-Appellants brought suit in the United States District Court for the Northern District of Georgia. The district court, Timothy C. Batten, Sr., C.J. (on occasion the "Lower Court"),  had subject matter jurisdiction over this action pursuant to United States Code Title 28, sections 1331, 1343(a), and 1367 because Plaintiff-Appellants, Mark Gardner, Ivory Streeter, and Lonnie Hood (hereinafter, collectively the "Officers"), brought a civil rights action under Title 42, section 1983 which presented federal questions and related state law claims over which the district court could exercise supplemental jurisdiction pursuant to Title 28, section 1367(a).

The district court entered its order granting Appellees' motions to dismiss (Doc. 144, 145, 148, 150) in their entirety with prejudice and entered a judgment on July 21, 2023. Doc. 173, 174. Officers timely filed a notice of appeal on August 16, 2023. Doc. 175. This Court has appellate jurisdiction pursuant to Title 28, section 1291 because Officers are appealing a final judgment.

## STATEMENT OF THE ISSUES

I.    The Trial Court erred in ignoring the Supreme Court's holding in *Buckley.*

1

II.     The Trial Court erred in applying an incorrect standard to these

        12(b)(6) Motions to Dismiss.

III.    The Court failed to address favorable factual allegations establishing

        actual malice in the New York Times sense and failed to address

        malice in its normal usage.

IV.     The Court failed to address additional liberty interests properly

        pleaded within Officers' complaint which addressed a second plus

        factor.

V.      The Court erred in determining an adequate Name-Clearing Hearing

        occurred.

VI.     The Trial Court misapplied the holding of *Captain Jack's Crabshack,*

        *Inc. V. Cooke, 2022 WL 4375364 (2022).*

VII.    The Lower Court utilized erroneous conclusions in determining that

        Howard could not have been a final policy maker for the county.

VIII.   The Lower Court improperly relied on inapposite caselaw to

        determine that officers failed to plead an equal protection claim.

## STATEMENT OF THE CASE

*A. General Background and Structure of Action*

Appellants (collectively referred to as "Officers") were police officers employed by the City of Atlanta. Doc. 141 at ¶¶5-7.[1] In the midst of protests and unrest, specifically against law enforcement, *id.* at ¶¶ 25-27, 119-20, 195-97, Appellants utilized justified, and wholly reasonable force against two parties who had committed multiple crimes. *See id* at ¶¶ 8-10, 112. Said force was found lawful by an independent prosecutor. *id.* at ¶¶ 107-108.

In order to benefit politically from the situation, Appellees Bottoms, Shields, and Howard turned Officers into scapegoats. *See, e.g.*, *id.* at ¶¶ 58-73, 74-91. Appellees did so by terminating Officers from their employment, placing their lives in danger, falsely arresting them, widely publicizing false accusations, and doing all of this while knowing full-well no wrong had occurred. *Ibid.*

The Operative Complaint[2] has certain pleading peculiarities which are of structural note. First, it notes that Howard in support of his re-election campaign, had created a quasi-police force within the Fulton County District Attorney's Office. *See, e.g.*, *id.* at ¶¶ 76-78. This quasi-police force was instituted to conduct

---

[1] Appellants cite to individual paragraphs within the Second Amended Complaint (SAC). Doc. 141.

[2] Appellants refer to their Second Amended Complaint as "Operative Complaint" throughout.

probable cause investigations—in other words the internal force was aimed at investigating in an effort to develop probable cause to secure arrests rather than conducting investigations *after* the establishment of probable cause—and this was noted time and time again. *See id.* at ¶¶ 77-78, 87-88, 98-99, 100. This quasi-police force had nothing whatsoever to do with prosecutions, but rather was aimed at investigating probable cause, in order to secure the arrest of "bad cops"—this allowed Howard to publicize the arrests and his "tough" stance on police practices. *Ibid.* In total, 61 hours elapsed between the incident at issue and publication by Howard of the arrests. *Id.* at ¶ 88. It is particularly telling that the events occurred on the evening of May 30, 2020, a Saturday, and that the probable cause investigation was finished and a press conference coordinated for the morning of Tuesday June 2, 2020, during which Howard bragged about his non-prosecutorial actions. *Id.* at ¶¶ 75–83.

Moreover, the Operative Complaint pleads that because Howard founded a quasi-police force, or parallel police force, utilizing Fulton County funding, Fulton County employees, and Fulton County resources, to conduct police-style probable cause investigations and secure arrests, utterly disconnected from his state duties as a prosecutor, performing the role of a law enforcement officer and agency. Howard took on a role in a county capacity, *i.e.*, Howard was the final decision maker for a county police force—although, he happened to be a district attorney, with state

4

**prosecutorial duties**, that role had nothing to do with his Fulton County law-enforcement role directly tied to the arrests at issue. *See id.* at ¶¶ 92-99.

In essence, a lynchpin of the pleading structure is the fact that in running a parallel county-funded police-force, Howard was both not working as a prosecutor and not acting in a state capacity, but rather was acting as an official of Fulton County exercising county powers over county staff:[3] Howard happened to have State duties, but running a quasi-police force to conduct probable cause investigations targeting police officers for political gain had nothing whatsoever to do with that State office and those State duties. *See id.* at ¶¶ 91, 99, 101.

Beyond Howard, the Operative Complaint complains of the actions of two City of Atlanta actors, Erika Shields—the chief of the City of Atlanta Police Department—and former mayor Keisha Lance Bottoms—and notes that their actions were final policies due to their authority. *See id.* at ¶ 184.  Moreover, the Operative Complaint includes an additional Fulton County actor, namely Greg Thomas, who worked under Paul Howard. *See id.* at ¶¶ 20, 93. The Operative

---

[3] It does not appear as if any previous complaint has alleged similar facts or attempted to abrogate prosecutorial immunity in this manner. Additionally, it does not appear as if any complaint addresses a State actor who takes on duties wholly different than those accorded to his State office utilizing municipal funding and staffing. The complaint is novel asserting that, as a matter of law, a district attorney performing law enforcement functions – as opposed to prosecuting cases brought by law enforcement- is not absolutely immune from suit.

Complaint likewise seeks to hold Fulton County liable under a final-policy maker theory of *Monell* liability. *Id.* at ¶¶ 77, 79, 89, 100-103, 188-191. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, (1978).

### B. *Relevant Procedural Background*

The instant matter never passed the motion to dismiss stage. *See generally* Doc. 173, 174. Appellees filed multiple rounds of motions to dismiss arguing that Officers failed to state a claim. *See, e.g.*, Doc. 144, 145, 148, 150. These motions to dismiss largely focused on various immunities; however, Appellees also argued that certain actions were inadequately pleaded due to the availability of post-deprivation due process and pleading of unsupported legal conclusions. *See, e.g.*, Doc. 148-1, p. 11-12 (arguing for qualified immunity); Doc 148-1, p. 15 (confusing both that plaintiffs were making equal protection claim based on protected class and based on *Olech*-style class of one theory); Doc. 148-1, p. 17-19 (noting availability of internal appeal and mandamus relief and concluding that bars stigma-plus claim).

### C. *Facts Pleaded*

#### 1. *Reasonableness of Officers actions*

The Officers specifically pleaded that all force they used was reasonable. *See, e.g.*, Doc. 141 ¶¶ 8-9, 39-43, 108, 112. Further, they pleaded that each

Howard, Bottoms, and Shields would have known such, or consciously chose not to investigate readily available evidence because such would have demonstrated the same. *Id.* at ¶¶ 70, 139-141. In essence they pleaded that each Bottoms, Shields, and Howard knowingly made false statements, *ibid.*, and that such was done with the intent to cause Officers harm and absent remorse. *Id.* at ¶¶ 142-143. This was all calculated to be done, in concert, to allow for Bottoms, Shields, and Howard to publicize their actions to maximize their own political gain. *Id.* at ¶¶ 14, 19, 58-59, 61, 63, 67-68, 74-76, 77-79, 83-85, 87, 89-90, 104-106.

2. *Non-Prosecutorial nature of actions*

The Officers pleaded they were never indicted, no indictment was presented to a grand jury, and no prosecution in fact took place. *Id.* at ¶108. Further they pleaded that Howard formed a quasi-police force utilizing Fulton County employees, which conducted police-style investigations in the first-instance, *i.e.*, prior to a determination of probable cause. *Id.* at ¶¶77-79, 100, 101. In the instant case, Howard directed a probable cause investigation that resulted in a press conference approximately 61 hours after the incident in question. *Id.* at ¶ 88. That this "investigation" was aimed at securing the arrests and determining probable cause, in order to allow for Howard to publicize the arrests for political gain, *Id.* at ¶¶ 85-87, and served no purpose relating to his duties as advocate or prosecutor. *Id.* at ¶¶ 90-91.

### 3. *County-Capacity Allegations*

The Officers pleaded with respect to County Actors acting in County capacity that Howard held both Fulton County and State Duties. *Id.* at ¶ 92. That Fulton County could and did provide County staff ("Fulton Staff") to the Fulton district attorney's office including Thomas. *Id.* at ¶ 93. That Fulton County pays the Fulton Staff; Fulton County provides for the Fulton Staff's retirement; Fulton Staff are subject to Fulton County Human Resources and administrative oversight; Fulton Staff are under the control of Fulton County and Fulton County is responsible for their training and hiring; and Fulton County provided Fulton Staff to Howard and placed him in the role of supervisor of the Fulton Staff. *Id.* at ¶ 95.

The Officers concluded that in this role not only were Howard and Thomas acting as Fulton County officials, but that moreover Howard exercised final policy making authority in this position. *Id.* at ¶¶ 96-797

### 4. *Monell Allegations*

The Officers pleaded with respect to *Monell* liability that Howard acted as a final policy maker for Fulton County, allowing and directing investigations to gather probable cause to arrest, and that as such his acts in that capacity caused Officers harm. *Id.* at ¶¶ 92-10. Moreover, Officers pleaded myriad times that Howard publicized his actions, the actions of his Fulton Staff, and his investigatory practices. *Id.* at ¶¶ 77, 89. 99-101, 155, 184. This was done, purposefully, and to a

wide audience, literally to promote his own popularity. *Ibid.* Relating to Shields and Bottoms, Officers pleaded that each acted in a final policy maker capacity in causing the harm to Officers for the City of Atlanta. *Id.* at 184. Moreover, the actions of Bottoms and Shields likewise were purposefully publicized. *Id.* at ¶¶58-68.

In essence, the Officers pleaded that the City and County each had actual knowledge of the acts that were causing the harm and that those actions were undertaken by the respective final policy makers of each of those municipalities.

5. *Deprivation of Liberty Interests and Stigma Suffered*

Officers pleaded that the stigmatizing statements were made close in time to the loss of both their employment and their false arrest. *Id.* at ¶¶ 173-177. They highlighted that in the public's mind the arrests would be closely connected to the published falsehoods of Howard, Bottoms, and Shields. *Ibid.* Moreover, it was clear that "actual malice" in the first amendment context was pleaded. *Id.* at ¶¶ 139-141, 112. Additionally, Officers also pleaded malice in the sense of intent to do harm or improper motives. *See, e.g.*, *id.* at ¶¶ 14, 17, 19, 63, 68, 70-73, 85.

6. *Additional Relevant Facts*

Officers clearly pleaded that Shields, Bottoms, and Howard acted with actual malice in the sense of knowing and intentional broadcasts of falsehoods. *See*

*supra*. Moreover, they likewise pleaded that each Shields, Bottoms, and Howard acted intentionally and knowing they were causing harm and violating constitutional rights. *See supra.* Finally, the actions throughout were coordinated in time, Shields, Bottoms, and Howard were in communication relating to the acts that were harming Officers, and that Shields and Bottoms agreed jointly to take their course of action as shown by their explicit, unequivocal statements. *See id.* at 60-63, 106, 201-202. Of particular note, Officers plead specifically that Bottoms stated that she and Shields were acting jointly. *Id.* at ¶ 64 (quoting Bottoms: "after review of that footage, *Chief Shields and I have made the determination* that two of the officers involved in the incident last night will be terminated immediately").

Finally, Bottoms and Shields clearly acted beyond their discretion by failing failed to carry out their ministerial duties established through the duly passed ordinances of the City of Atlanta in dismissing Officers without due process. *Id.* at ¶¶ 217, 224, 226.

### D. The Lower Court's Order Dismissing All Counts

The Lower Court dismissed all counts. The Lower Court determined that Howard was acting in a prosecutorial capacity, and that all allegations to the contrary were mere legal conclusions. Doc. 173, p. 10-12. The Lower Court found that the stigma-plus claim failed due to the availability of post deprivation remedies. Doc. 173, p. 14-18.

From this point, the Lower Court concluded that because Howard was acting in a prosecutorial capacity, he was acting as a State Actor. Doc. 173, p. 20-21. Finally, as to the County Actors, the Lower Court determined that Gregg acting as a prosecutorial investigator was entitled to prosecutorial immunity because he was taking part in a *prosecutorial* investigation. Doc. 173, p. 22-24. While in making statements to the press Howard could not be afforded prosecutorial immunity, he was afforded official immunity on the state claim and on the federal stigma-plus claim the availability of either writ relief or administrative appeal to re-secure one's employment was adequate post deprivation process.[4] Doc. 173, p. 12, 14-18.

Largely relying on the above analysis, the Court found that neither Shields not Bottoms could be liable for a stigma plus claim, (Doc. 173, p. 41-42) and determined that there was not adequate malice pleaded to support a defamation claim.[5] Doc. 173, p. 45-46.

Likewise, the Court found that the Officers failed to adequately allege the knowledge of the municipalities required to demonstrate municipal liability and, in any event, failed to demonstrate that Howard was acting as a final policy maker for

---

[4] The Court never addressed the intersection of *Monell* and its effects on adequacy of post-deprivation due process, nor analyzed whether that process could either provide a name clearing function or restore other liberty interests lost in conjunction with the stigmatizing statements.

[5] The Court found the pleadings relating to actual malice to be conclusory and thus unable to overcome official immunity.

the County. Doc. 173, p. 30-32. The Court never addressed whether municipal liability was pleaded as it relates to the City and official capacity claims against Shields and Bottoms.

Addressing qualified immunity for Shields and Bottoms, the Lower Court concluded that they were acting within the scope of their authority in making statements to the press—it does not apparently address whether Bottoms had the ability to terminate a police officer's employment—and as such were entitled to qualified immunity. Doc. 173, p. 35-38.

While this qualified immunity conclusion did not prove dispositive to the Lower Court's analysis, the Lower Court clearly states that it would have found such to exist—that occurred based on averments made by defendants, that appear contrary to facts pleaded—and without analyzing whether the rights alleged violated were clearly established at the time the rights were alleged violation occurred. Doc. 173, p. 37.

## **STANDARD OF REVIEW**

The standard of review is *de novo. Stevens v. Plumbers & Pipefitters Local 219*, 835 Fed. Appx. 499, 501 (11th Cir. 2020) (holding *de novo* review applies to "a district court's order granting a Rule 12(b)(6) motion to dismiss.") (citing *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1210 (11th Cir. 2020)).

To the extent this appeal requires the Court to address additional questions involving the application or misapplication of law, the standard of review is the same (*de novo*) as these are pure questions of law. *See U.S. v. Harris*, 244 F.3d 828, 829 (11th Cir. 2001) (citing *Doe v. Chiles*, 136 F.3d 709, 713 (11th Cir.1998)). Further, and in any event, the errors complained of herein involve the misinterpretation or misapplication of law which in and of itself constitutes an abuse of discretion. *See Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1333 (11th Cir.2004) (holding a "district court abuses its discretion if it misapplies the law . . .").

## <u>SUMMARY OF THE ARGUMENT</u>

Officers' argument largely focuses first on a misapprehension of binding precedent, *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), relating to prosecutorial immunity and the nature of that holding. The Officers argued below that the holding narrows a court's analyses of investigative acts to the timing of their occurrence in relation to a finding of probable cause, or in other words, that it does not require a court to look at the investigatory acts themselves to determine whether or not they are in fact "investigatory" in the sense of abrogating their prosecutorial nature, but rather look to the purpose of those actions—whether they are aimed at establishing probable cause to effectuate arrest or whether they are

13

instead aimed at determining the viability of a legal criminal case *after* an initial determination of probable cause by traditional law enforcement officers.

Because many of the Lower Courts' findings hinge on this initial determination, the error in analysis taints many subsequent legal conclusions.

Moving forward, there appears throughout the Lower Courts' analysis a general misapplication of pleading standards and standards of review as it relates to a motion to dismiss. Throughout the Lower Court's analysis, it makes unfavorable inferences and fails to accept facts as true—moreover, the Lower Court with regularity appears to afford Officers the least favorable interpretation or reading of their complaint in order to find pleading "failures."[6]

---

[6] For instance, Officers pleaded that Howard and Bottoms knowingly peddled falsehoods in order to advance their personal and professional careers. Doc. 141, p. 13-19. This was done due to the political climate and the unpopularity of law enforcement at the time the constitutional violations were alleged to have occurred. Doc. 141, p. 28. A savvy judge may certainly state that it is more likely than not that Howard and Bottoms were good-faith actors, who made an honest mistake, but that is certainly not what is pleaded and certainly a party can draw a reasonable inference that a politician acted dishonestly, knowingly publicizing falsehoods, for political gain during a hotly contested campaign.

> Defendants Howard, Shields, and Bottoms, each had available to them evidence which would have demonstrated the falsity of their statements, but made a conscious decision to ignore the same in order to make statements which created a politically advantageous and expedient narrative. Further, Defendants made a conscious choice to conduct virtually no investigation because an investigation would have taken time, which would have

14

The above are generally compounded and made worse by failures to consider certain legal concepts as definite and isolated, *e.g.*, "actual malice" in the sense of *New York Times v. Sullivan* and "actual malice" in the sense of evil intent or failures to consider various avenues of liability, *i.e.*, final-policy maker liability under *Monell* or liberty interests pleaded in addition to the loss of employment relating to a stigma-plus theory of liability. *New York Times v. Sullivan*, 376 U.S. 254 (1964).

All of the above were errors which directly contributed to the Court dismissing the matter with prejudice and erroneously granting the motions to dismiss.

---

prevented Defendants from taking advantage of heightened media attention.

Doc. 141, p. 31.

The above facts pleaded are not those "little green men" or "recent trips to pluto" which the Court may disregard as false and not afford the assumption of truth to. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009).

## **ARGUMENT**

### I.    THE TRIAL COURT ERRED IN IGNORING THE SUPREME COURT'S HOLDING IN *BUCKLEY*.[7]

### A. The Central Holding in *Buckley* Delineates Prosecutorial and Investigative Functions Under a Temporal Framework.

The Supreme Court's holding in *Buckley* could not be clearer; it is an explicit dictate: "A prosecutor neither is, nor should consider himself to be, an advocate *before he has probable cause to have anyone arrested*." *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993) (Emphasis added). Moreover, *Buckley*, makes clear that a prosecutor may not *post hoc* veil his pre-probable cause actions in prosecutorial immunity by *initiating* a prosecution. *See Id.* at 275-76; *see also id.* at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial . . .").

The plain language of the holding and facts of the case make clear the dispositive nature of the timing of the acts of the prosecutor-defendant in

---

[7] Officers address this point initially as it plays a critical role in virtually every other ruling and analysis present in the Order.

determining whether or not those actions are prosecutorial in function or more akin to those of an executive actor investigating a matter to determine probable cause - actions typically performed by law enforcement officers. If those actions take place prior to the establishment of probable cause they are the actions of a first-instance investigator, no different than the actions of a detective or police officer and entitled to no greater immunity, *see id.* at 273-74; if those actions occur after a first-instance determination of probable cause they are the actions of an advocate determining whether or not prosecution is viable and in furtherance of this prosecution. *See id.* at 273 ("the detective's role in searching for the clues and *corroboration that might give him probable cause to recommend that a suspect be arrested*"), 274 ("The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character.") (emphasis added).

> [I]t is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other. Thus, if a prosecutor [investigates for probable cause], he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction.
>
> *Id.* at 273-74 (cleaned up).

In essence, if a prosecutor's actions are pre-probable cause determination there is no role whatsoever for a prosecutor and no prosecutorial immunity available. *Id.* at 274 ("*A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested*") (emphasis

added). Defendants Howard and Thomas unequivocally investigated with a goal to create probable cause.

While Officers believe this holding to be pellucid from the language utilized by the *Buckley* Court and the only natural reading of the opinion, logic likewise requires the same conclusion. The investigative actions that prosecutors and police officers undertake, themselves, are largely identical when disconnected from purpose and time. For instance, a prosecutor often reviews the selfsame evidence reviewed by a first instance investigator. A prosecutor may speak to the selfsame witnesses and make identical inquiries into credibility. A prosecutor very well may physically go to a location where a crime occurred to try to better understand the factual basis underlying the alleged crime—indeed, comparing bootprints to boots.

These actions, when viewed in a vacuum, are no different than the investigatory acts undertaken by a police officer or detective. Describing the acts themselves divorced from timing and purpose does nothing, whatsoever, in elucidating whether or not those investigatory actions are prosecutorial in nature or aimed at establishing probable cause. Were the functional test in *Buckley* a test that required enumeration and recitation of investigatory actions, such would be meaningless, because the investigatory acts are often identical; it is their *purpose and timing* that decides their prosecutorial or non-prosecutorial nature. Prosecutorial actions occur *after* arrests by law enforcement.

18

The holding in *Buckley,* rather, requires a Court to analyze the purpose underlying those actions—identical actions that may be prosecutorial or investigatory in nature—as they relate to purpose based on a defined event. The event, again made explicitly clear in *Buckley*, is the determination of probable cause. Where a prosecutor investigates prior to his role as advocate, *Buckley*, 509 U.S. at 274 (prosecutor neither is, nor should consider himself to be, an advocate *before* he has probable cause to have anyone arrested), he or she can claim *no prosecutorial immunity*. *Id.* Where such is done after probable cause has been established, it becomes shielded by prosecutorial immunity. *Id.*

While legislatures, or indeed judges, may question the wisdom of a bright line, temporal rule—indeed, Appellants recognize the danger of creating a roadmap to abrogating immunity—that *is* the rule established by *Buckley* and until that holding is altered by the Supreme Court or by superseding statute that is the rule that must be applied.[8]  Further, a prosecutor acting as an officer would be entitled to raise qualified immunity.

_____

[8] To the extent that such may adversely affect prosecutors, *Buckley's* message is clear: do not act prior to the establishment of probable cause by executive actors; do not participate in actions which seek to establish probable cause or in furtherance of securing an arrest in the first instance.

Again, while the holding may seem excessively harsh, it does nothing but require executive actors to conduct investigations in the first instance, and prosecutors to step in *after* a determination of probable cause by executive actors.

19

Officers pleaded that Mr. Howard and other members of his office made a conscious decision to step outside of their prosecutorial roles. *See, supra*, Subsection C(2) (Non-Prosecutorial Nature of Actions). They did this *because* they chose to step into the boots of law enforcement in order to make a first-instance determination of probable cause. They did this prior to the establishment of probable cause by traditional law enforcement and while traditional law enforcement were conducting their own investigation.  Mr. Howard knew that traditional law enforcement would issue a report and make a determination of probable cause; however, he made a decision not to wait for the same because of political expediency. The moment Mr. Howard and those who assisted him made the decision to investigate prior to the determination of probable cause, they stepped outside of their prosecutorial roles and simply did not have *any role as advocates* prior to a determination of probable cause.

Given the above, there remains a legitimate question as to whether Officers adequately pleaded facts which could survive a motion to dismiss. As recited at length above, *see supra* Subsection C(2), they most certainly did. Further, the Lower Court's ruling provides blanket immunity to any prosecutor irrespective of their actions or motives.

---

Finally, the holding does not act as a bar to prosecutors determining probable cause, but makes clear that should they voluntarily step into *that* role, they will not hold peculiar the benefits of their office and absolute immunity from suit.

**B. This Court Must Reverse for the Lower Court to Properly Apply Binding Law.**

At a minimum, the Lower Court erred in applying an erroneous interpretation of binding caselaw and faulty legal framework to the factual allegations in question. Because the above decision influenced myriad holdings within the Lower Court's decision and formed the foundation for much of the holding, the entire basis for the same is compromised and constituted an abuse of discretion. *See Hatcher v. Miller (In re Red Carpet Corp.)*, 902 F.2d 883, 890 (11th Cir.1990) ("[a]n abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper [legal] procedures in making the determination.").

## II. THE TRIAL COURT ERRED IN APPLYING AN INCORRECT STANDARD TO 12(b)(6) MOTIONS TO DISMISS.

In similar fashion, the Lower Court simply misapplied concrete legal standards in interpreting the allegations leveled in the Operative Complaint and determining the merits of the Motions to Dismiss.

The Supreme Court has noted, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("*Twombly*") (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "[F]or

21

the purposes of a motion to dismiss [a court] must take all of the factual allegations in the Complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("*Iqbal*").

To survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." 550 U.S. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal*, 129 S. Ct. at 1949. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. However, "a well-pleaded Complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted); *see also id.* at 570 (noting that plaintiffs must "nudge[] their claims across the line from conceivable to plausible").

To state a claim with sufficient specificity "'requires a complaint with enough factual matter (taken as true) to suggest' the required element." The rule "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable expectation that discovery will

22

reveal evidence of the necessary element.'" *Secretary of Labor v. Labbe*, 319 Fed. Appx. 761, 763 (11th Cir. 2008) (quoting *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007); *Twombly*, 127 S. Ct. at 1965)) (emphasis added).

The Seventh Circuit in *Swanson v. Citibank N.A.*—cited with approval by this Court, *see, e.g.*, *Doe v. Samford Univ.*, 29 F.4th 675, 695 (11th Cir. 2022) (Jordan, A. concurring) (quoting *Swanson*, 614 F.3d 400, 404 (7th Cir. 2010)) has adroitly explained this standard:

> The Supreme Court requires only a plausible inference of the existence of an [element]. It does not require the Plaintiffs to present a *more* compelling or convincing theory than any other. As we understand it, the Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen. For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.
> *Swanson*, 614 F.3d at 404 (emphasis original).

The Officers certainly plead a narrative that *could have happened* and that was the entirety of their burden.

The Lower Court ruled that the Plaintiff had pled legal conclusions without alleging "sufficient factual matter" as required by *Twombly* and *Iqbal*; however, the Operative Complaint at issue is far from a bare recital of the statutory elements of claims or simple legal conclusions, but rather supported factual assertions which culminate in pleadings of facts that take the form of conclusive statements. For

instance, Officers plead, that Howard formed a quasi-police force, (Doc. 141, p. 16) aimed at investigating crimes to determine probable cause and effect arrests, (Doc. 141, p. 17) and that these investigations occurred immediately after the alleged crime with great rapidity, (Doc. 141, p. 19) which allows for them to plead an ultimate fact, namely that Howard was acting without his prosecutorial capacity. Moreover, while a court may disbelieve the facts pleaded, it cannot disregard them and conclude to the contrary unless they are utterly fantastical. "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *Iqbal*, 556 U.S. at 696. "The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." *Iqbal*, 556 U.S. at 696.

Pleading a politician, driven by craven cupidity, placed personal advancement and avarice over the interests of innocent men and abstract morals, thereby intentionally doing wrong is very different than pleading one has travelled in time, especially when the charges at issue were dismissed by a special prosecutor.

The Lower Court specifically chose to disbelieve that there was malice, in the sense of an intent to do wrong, that there was knowledge to support *Monell* liability, that Howard was acting as a prosecutor, that County Actors were acting in

a County Capacity, that Bottoms and Shields knowingly told falsehoods, that no reasonable actor would have acted in the manner of Bottoms and Shields, that the hearing afforded Officers was adequate to clear their names, that there was no reasonable or rational basis for certain actions, and that there was no agreement between Bottoms and Shields.

Each of these was determinative to the Lower Court's determination that dismissal was appropriate and as discussed above, each was pleaded with more than sufficient factual matter to be afforded the assumption of truth. *See, supra* Section C(2).

*Twombly* emphasized that it is does not impose heightened pleading requirement nor is it seeking to broaden F.RC.P. Rule 8, "which can only be accomplished 'by the process of amending the Federal Rules and not by judicial interpretation.'" 550 U.S. at 569, n. 14. Rather, *Twombly* simply clarifies the standard under which Rule 12(b)(6) motions are to be decided. Under that standard, a complaint must include sufficient factual allegations to create a plausible expectation that, *with discovery*, a plaintiff will be able to adduce sufficient facts to support the pled cause of action. Officers Operative Complaint is sufficient to meet that standard, and dismissal is wholly inappropriate.

25

### III. THE COURT FAILED TO ADDRESS FAVORABLE FACTUAL ALLEGATIONS ESTABLISHING ACTUAL MALICE IN THE NEW YORK TIMES SENSE AND FAILED TO ADDRESS MALICE IN ITS NORMAL USAGE.

The Lower Court concludes its actual malice inquiry by stating:

> After carefully reviewing the second amended complaint, the Court cannot find any non-conclusory factual allegations that would allow a jury to reasonably infer that Bottoms and Shields deliberately intended to do wrong when they terminated Plaintiffs' employment and made public comments about Plaintiffs.

Doc. 173, p. 47.

First, whether or not a party deliberately intended to do wrong, and for that matter animus or malice, has very little to do with "actual malice," which the Officers needed to plead to bring a defamation claim. *See generally Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991). Likewise, the Court noted, confusingly, that reckless disregard for truth or falsity has nothing to do with "actual malice." Doc. 173, p. 46.

To clear this *very* issue up the Supreme Court has stated:

> Actual malice under the *New York Times* standard <u>should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will</u>. See  *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. See *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666, n. 7, 109 S.Ct. 2678, 2685, n. 7, 105 L.Ed.2d 562 (1989). In place of

26

the term actual malice, it is better practice that jury instructions refer to publication of a statement with *knowledge of falsity or reckless disregard as to truth or falsity.*

*Masson*, at 510-11(Emphasis added).

With all respect due to both the Lower Court and the *Daley* Court to which it cites, neither are discussing the correct concept, namely "actual malice" in the *New York Times v. Sullivan* sense. *See* Doc. 173, p. 46 (citing *Daley v. Clark*, 638 S.E.2d 386). *Daley* is discussing a term of art in Georgia law that applies to abrogating state immunity—that case has not a wit to do with the First Amendment, nor anything whatsoever to do with "actual malice" in the *New York Times* sense.

In other words, the Officers either were addressing *New-York-Times* actual malice in a very sensible way, and addressing evil-intent-type-Georgia "actual malice" in statements such as "Bottoms knew that her actions violated Plaintiffs' due process rights and undertook the above actions knowing such" or "Defendants Shields and Bottoms were aware of the required process, but willfully chose to ignore it. The actions of Defendants Bottoms and Shields constitute a deliberate, concentrated, and malicious effort, in concert and in conspiracy with one another, to deny Plaintiffs their rights to said investigations . . ." or even the bluntest:

Defendant Bottoms acted with actual malice directed at Plaintiffs, with the intent to cause them harm, indifferent to their

27

rights, to further his own personal interests and political agenda.
Doc. 141,¶ 14.

It appears as if the Lower Court conflates two legal concepts and addresses

factual matter that addresses the one concept while citing to caselaw that addresses

the other.

As to evil intent, *i.e.*, malice in the *Daley* sense, Officers pleaded that

Appellees placed their lives in literal danger, while knowingly trading in

falsehoods, in order to enjoy personal and professional gain. *See generally supra*

Section C(1), (5). Officers pleaded that a deliberate decision was made to sacrifice

them in order to further political aspirations. *Ibid,* Additionally, Officers pleaded

that the actions were deliberately done, with the knowledge and done intentionally.

*Id.* This was done in the framing of a larger pleaded-narrative which seems very

much so to be squarely within the realm of possibility as reasonably pled.

In essence, Officers pleaded that there existed significant political and public

discontent. Doc. 141, p. 7, 28. In this atmosphere of political discontent, there was

significant sentiment aimed against police officers, especially those who used

force. *Ibid.* In order to curry personal favor and to advance their positions, City

actors made a deliberate choice to publicly condemn men who had done nothing

whatsoever wrong. Doc. 141, p. 31. Further, it was well-known that nothing

incorrect had been done by Officers, yet still the Appellees acted in such a manner

to maximize harm to Officers and potential gain to themselves. *Id.* All of this was done in addition to pleading that the acts were taken with the necessary mental state. *See, e.g.*, Doc. 141, p. 4-5 (specifically pleading intent and malice).

Officers would further note that within the scope of a defamation action, it is highly sensible to equate knowledge of falsity with knowingly doing wrong.; however, in any event, clearly the Lower Court erred in failing to address facts which specifically address malicious intent and conflating *New York Times* "actual malice" with evil-intent "actual malice."

### IV.    THE COURT FAILED TO ADDRESS ADDITIONAL LIBERTY INTERESTS PLEADED WITHIN OFFICERS COMPLAINT WHICH ADDRESSED A SECOND PLUS FACTOR.

Succinctly, the Lower Court misapprehended the nature of the Officers' stigma plus claim. The claim did not simply plead a loss of employment interest, it pleaded two separate interests lost in connection with the stigmatizing statements. Doc. 141, p. 36-37 (clearly pleading liberty interest at ℙ 180). One was employment, a property interest, the second was a liberty interest—this oversight is particularly curious given the clarity of Officers' opposition elucidated in briefing.

## V.    APPELLEES LIKEWISE ADDRESS AN ERRONEOUS THEORY OF LIABILITY ON THE STIGMA PLUS FAILING TO ADDRESS THE OTHER PLUS

Plaintiffs did not plead the loss of their employment as the only plus factor. SAC at ¶ ¶ 180-81 (noting loss of physical liberty and factor).

> A Fourth Amendment violation coupled with a stigmatizing statement that the public would perceive, is a cognizable stigma plus-claim. *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980) (finding stigma plus where "the defamation did not cause the violation of appellants' fourth amendment rights; *however, the public surely perceived the defamatory statements made by the police and Rashkind to be connected to the arrests and search and seizure.*") Defendants simply ignore this. Furthermore, *Marreo* clearly establishes this constitutes a stigma plus claim. *Id.*

Doc. 161, p. 6 (formatting original).

In order to have properly determined what process was due, the Lower

Court, at a minimum, should have been clear on what liberty and property interests

were lost in addition to the stigmatizing statements. Even accepting the entirety of

the Appellees' arguments and the Lower Courts' reasoning, simply because they

were considering a fundamentally different style of stigma-plus claim, are

insufficient and unreasonable:

> It is the name-clearing hearing that is the remedy. Under *McKinney v. Pate*, 20 F.3d 1550, 1557 (1 1th Cir. 1994) (en banc) the remedy for the deprivation of a name-clearing hearing is an injunction ordering the employer to provide a hearing, not damages. *McKinney*,20 F.3d at 1557; see also *Codd v. Velger*, 429 U.S. 624, 627 (1977).

Doc. 112, p. 9.

30

In providing a hearing, the employer does nothing to address a false arrest or televised public statements of criminality when coupled with a false arrest, nor will mandamus relief, nor does an employer-based name clearing address the stigma-plus at issue here. In other words, a stigma plus claim based on a false arrest does not involve an employer—this one happened to, but very often such will not be the case. Clearly, the case at bar is different than a dismissal from employment case absent false arrest and worldwide publication.

Moreover, whereas here there is a significantly different loss, it only makes sense that there should be a new balancing of what process is due. The very test applied by the Sixth Circuit, *See Ganasekera v. Irwin*, 551 F.3d 461, 470-71 (6th Cir. 2009*)* and required under *Mathews v. Edridge*, 424 U.S. 319, 334 (1976) (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands"). As *Mathews* makes painfully clear, the nature of due process is that it adapts to the severity of the loss at issue. *id.* No party, bar plaintiff, thought a *Mathews* or *Mathews* style analysis worthwhile. Doc. 161, p. 13-15.

The name clearing hearing afforded Appellants was inadequate to clear their names and undo the harm that had reputational befallen them. There is no caselaw clearly establishing that in a matter such as this—with worldwide publication and accompanying publicized arrest—the availability of successfully pursuing an

31

internal administrative appeal affords an *adequate* name clearing hearing (Doc. 161, Page 12); nor was there any law establishing that *mandamus* relief compelling the hearing or for an officer to do his or her duty would have provided anything akin to an adequate name clearing function. *Id.*

In any event, the motions to dismiss and the Lower Court's analysis of the same are fundamentally flawed in that they fail to address the actual "plusses" pleaded, specifically the false arrest and loss of liberty.

## VI.    THE COURT ERRED IN DETERMINING AN ADEQUATE NAME-CLEARING HEARING OCCURRED.

Moving forward, and very curiously, it does not seem as if the Lower Court considered the fact that there are many injuries for which *post-deprivation* due process simply is not adequate.[9] Indeed, it would be rather risible to contend that a post-deprivation hearing could provide the process needed to deprive people of certain interests; a life for instance once lost is lost irrevocably and thus no *post deprivation* process, regardless of its protections, is particularly compelling. The same is true of the professional reputations of Appellants who represent over six decades of law enforcement service.

---

[9] One is of course afforded due process in a section 1983 false arrest claim, indeed an element is eventual acquittal or other favorable outcome, but due to the nature of the loss, *i.e.*, the loss of ones' liberty, there is no process which can undo the loss.

In certain respects, the damage done in the instant case represents a harm rather akin to the loss of a life;[10] a reputation taken a lifetime to build may be destroyed in a moment —if the destruction is done on a wide enough scale and by credible parties, such is akin to reputational death.[11]  Bottoms, Howard, and

---

[10] This peculiar similarity between life and good name has been noted in different contexts for hundreds of years. *See, e.g.*, *De Libellis Famosis*, 3 Co. Rep. 254, 255, pt. v, fol. 125, 77 Eng. Rep. 250, 251 (1605).

[11] The actions here could very well be that described in Justice Brennan's concurring opinion in *Paul v. Davis,* 424 U.S. 693, at 725, 726 (1976):

> Today's decision marks a clear retreat from *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), a case closely akin to the factual pattern of the instant case, and yet essentially ignored by the Court. Jenkins, which was also an action brought under s 1983, both recognized that the public branding of an individual implicates interests cognizable as either "liberty" or "property," and held that such public condemnation cannot be accomplished without procedural safeguards designed to eliminate arbitrary or capricious executive action. Jenkins involved the constitutionality of the Louisiana Labor-Management Commission of Inquiry, an executive agency whose "very purpose . . . is to find persons guilty of violating criminal laws without trial or procedural safeguards, and to publicize those findings." 395 U.S., at 424, 89 S.Ct., at 1850, 23 L.Ed.2d, at 418.
>
> "(T)he personal and economic consequences alleged to flow from such actions are sufficient to meet the requirement that appellant prove a legally redressable injury. Those consequences would certainly be actionable if caused by a private party and thus should be sufficient to accord appellant standing. See Greene v. McElroy, 360 U.S. 474, 493, n. 22, 79 S.Ct. 1400, 1411, 3 L.E2d 1377 (1959); Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 140-141, 71 S.Ct. (624), at 632 (95 L.Ed. 817) (opinion of Burton, J.); Id., at 151-160, 71 S.Ct. (624), at 637-642 (95 L.Ed. 817) (Frankfurter, J., concurring). It is no answer that the Commission has not itself

Shields made concerted efforts to widely publicize both Officers "wrongdoing"—though none actually occurred--and their own very tough stance on such wrongdoing was deliberately disseminated to the maximum audience. Doc. 141, p. 14-19, 31.

All of this this, though, largely belongs in a *Mathews* test analysis, which was not conducted, as noted above, or in what appears to be a very, very reasonable proportionality requirement as set forth by the Sixth Circuit in *Ganasekera.* 551 F.3d at 470-71.

The great irony is that the above may simply prove moot in this case because Bottoms and Shields were final policy makers, and the acts of final decision makers who take without *pre-deprivation* due process cannot fall into the exceptions set forth in *Parrat/Hudson. See generally Parrat v. Taylor*, 451 U.S. 527, 536-39 (1981) (noting that meaningful hearing required before final taking) (overruled for different reasons in *Daniels v. Williams*, 474 U.S. 327 (1986)).

The barring of due process claims due to *post-deprivation* remedies is

---

tried to impose any direct sanctions on appellant; it is enough that the Commission's alleged actions will have a substantial impact on him. . . . Appellant's allegations go beyond the normal publicity attending criminal prosecution; he alleges a concerted attempt publicly to brand him a criminal without a trial." Id., at 424-425, 89 S.Ct., at 1850, 23 L.Ed.2d, at 418.

appropriate *only* where an intentional deprivation is not in accordance with policy. *See Hudson v. Palmer*, 468 U.S. 517, 532 (1984) ("post deprivation remedies do not satisfy due process where a predeprivation of property is caused by conduct pursuant to established state procedure") (citing *Logan v. Zimmerman Brush*, Co., 455 U.S. 422 (1982)). "[A]t least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one whose edicts or acts may fairly be said *to represent official policy* for which the county may be held responsible under section 1983." *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir.1980).

In other words, if there is an intentional deprivation, a post-deprivation remedy can *only* ever be adequate where that deprivation occurs contrary to policy. If the deprivation is in line with policy, or say pursuant to policy—made by a final policy maker—than *no* post-deprivation due process can ever be adequate, because the policy is to deprive absent process. Both Bottoms and Shields were unequivocally final policy makers.

> Where a municipal officer operates pursuant to a local custom or procedure, the *Parratt/Hudson* doctrine is inapposite: actions in accordance with an "official policy" under *Monell* can hardly be labeled "random and unauthorized." As this Court noted, *where employees are acting in accord with customary procedures, the "random and unauthorized" element required for the application of the Parratt/Hudson doctrine is simply not met.*

 *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) (citing *Brooks v.*

*George Cnty., Miss.*, 84 F.3d 157, 165 (5th Cir. 1996)).

In *Woodard* because *Monell* liability was pleaded—*per se* the actions were pursuant to established policy—and therefore the availability of post-deprivation remedies simply cannot bar the claim. *See id.* at 354 ("Thus, [Plaintiff] has established that she was deprived of her property without due process of law through the custom or practice of a state agent acting under the color of state law. Because the *Parratt*/*Hudson* doctrine is not applicable and because Woodard has stated a valid due process claim, the district court erred in dismissing Woodard's due process claim under Rule 12(b)(6).")

Here Howard, Shields, and Bottoms were *all* final policy makers, so their acts were, by definition, policy, *i.e.*, not the types of deprivations which are subject to bar due to availability of post-deprivation remedy.

Moreover, neither the Lower Court, nor the Appellees sought to discuss the matter with any depth—indeed, neither explicitly or implicitly discussed the application of *Parratt*/*Hudson* or acknowledged the existence of caselaw which Officers certainly brought to the attention of all parties. *See, e.g.*, Doc. 100, p. 22-23, Doc. 102, p. 32-33, Doc. 161, p. 13.

## VII.  THE TRIAL COURT MISAPPLIED THE HOLDING OF *CAPTAIN JACK'S CRABSHACK, INC. V. COOKE, 2022 WL 4375364 (2022)*.

*Captain Jack's* is in many ways is a case about pleading facts to support the

ultimate pleading that prosecutors "directed" investigatory acts of first-instance

investigators. *Captain Jack's Crabshack, Inc. V. Cooke, 2022 Wl 4375364 (2022)*

> Looking to plead their way around this, the Bartletts pointed to certain "investigative" conduct in their complaint. The Bartletts alleged, for example, that the prosecutors "directed an illegal raid," "insist[ed]" that the officers include the "fabricated evidence" in the warrant affidavit, and acted in their "investigative capacities." But the Bartletts failed to include "enough facts" to "plausibl[y]" allege that the prosecutors directed the search, fabricated evidence, or acted in an investigative capacity. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). For example, they don't tell us how the prosecutors "directed" any search, what the prosecutors did to "insist[ ]" on any false statements, or how they were acting in their "investigative capacities." After *Twombly* and *Iqbal*, we do not credit "[c]onclusory allegations, unwarranted deductions of facts[,] or legal conclusions masquerading as facts." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (quotation omitted).
> *Captain Jack* at *7.

The *Captain Jack's* Court goes on to explain not why prosecutors hold

immunity for directing a search or fabricating evidence, but rather explaining how

plaintiffs in that matter failed to plead facts which allowed one to conclude that

such direction occurred. *Id*. Indeed, the *Captain Jack's* Court specifically

distinguished the pleadings present in that matter with the more detailed pleadings

present in *Rieves v. Town of Smyrna*, 959 F.3d 678 (6th Cir. 2020). *Id*.

37

Here, there was what may be described as an ultimate conclusion backed by additional facts which certainly allowed for that ultimate conclusion, namely that Howard and Thomas, were acting in an investigatory capacity and therefore were acting outside the scope of their duties prosecutor.

Howard in support of his re-election campaign, had created a quasi-police force within the Fulton County District Attorney's Office. *See, e.g.*, Doc. 141 at ¶¶ 76-78. This quasi-police force was instituted to conduct probable cause investigations—in other words the internal force was aimed at investigating probable cause to secure arrests rather than conducting investigations *after* the establishment of probable cause—and this was noted time and time again. *See id.* at ¶¶ 77-78, 87-88, 98-99, 100. This quasi-police force had nothing whatsoever to do with prosecutions, but rather was aimed at investigating probable cause, in order to secure the arrest of "bad cops"—this allowed Howard to publicize the arrests and his "tough" on police practices. *Ibid.* In total 61 hours elapsed between the incident at issue and publication by Howard of the arrests. *Id.* at ¶ 88. It is particularly telling that the events occurred on the evening of May 30, 2020, a Saturday, and that the probable cause investigation was finished and a press conference coordinated for the morning of Tuesday June 2, 2020. *Id.* at ¶¶ 5, 29, 99, 102.

38

The point being, while certainly prosecutors "are entitled to absolute immunity for presenting evidence to a judicial officer to obtain a search warrant[,]" and a party may not simply plead that a prosecutor was acting as an investigator, neither was present in this case, nor does *Captain Jack's* address the sufficiency of temporal-centric facts relating to determining whether a prosecutor was acting in an investigatory capacity.

### VIII. THE LOWERCOURT UTILIZED ERRONEOUS CONCLUSIONS IN DETERMINING THAT HOWARD COULD NOT HAVE BEEN A FINAL POLICY MAKER FOR THE COUNTY.

As set forth above, the Lower Court improperly concluded that Howard was acting as a prosecutor, because there is clearly established law holding a prosecutor acting in his capacity as a prosecutor is indeed a state actor, that analysis was one which need not have been conducted—that law is unimpeachable. A district attorney *acting as a prosecutor* is a state actor under Eleventh Circuit precedent.

Howard, however, was not acting as a prosecutor which at a minimum requires a new inquiry to address if whether a district attorney acting in a non-prosecutorial capacity engaged in first-instance police-style investigatory work (utilizing County funding and County employees) is in fact a state actor. The appellants briefed the issue multiple times and strongly believe that in such a role Howard was acting in a County rather than State capacity—largely because the function is so very <u>*disconnected*</u> from his state duties as a prosecutor. All this said,

it is a question which the Lower Court failed to address because it relied on a flawed construction of the law and an erroneous conclusion that Howard was acting as a prosecutor.

This on its own is sufficient for reversal as it constitutes an abuse of discretion.

## IX.    THE LOWER COURT IMPROPERLY RELIED ON INAPPOSITE CASELAW TO DETERMINE THAT OFFICERS FAILED TO PLEAD AN EQUAL PROTECTION CLAIM.

First, Appellees as the moving party bore the heavy burden on a motion to dismiss. *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1581 (11th Cir 1986) (holding burden is upon the moving party to show to a certainty that the plaintiff is not entitled to relief). The City Actors relied on wholly erroneous caselaw to argue that the Officers failed to plead an *Olech* "class-of-one" equal protection claim—the Officers did not attempt to do so and this failure alone should have proven dispositive: Appellees argued the wrong law. Doc. 148-1, p. 14-15.

However, the Lower Court instead made its determination based upon, apparently, *Phillips v. City of Atlanta*, No. 1:15-cv-3616-TWT-RGV, 2016 WL 5429668, at *8 (N.D. Ga. July 29, 2016) and *Bah v. Little*, No. 1:13-cv-2571-WSD, 2014 WL 4230095, at *4 (N.D. Ga. Aug. 26, 2014). *Bah* was in essence a national origin case, the plaintiff's alleged that the actions taken against them were

40

due to xenophobia and having non-American names; in essence it was pleaded because their name sounded foreign, they received disparate treatment, but absolutely no facts were averred relating to why this may have been a motivation. *Phillips* was a race-based disparate treatment claim (in itself a notable difference), wherein there were no facts pleaded that demonstrated a race-based motivation.

Appellants have explained *why* they were targeted for disparate treatment and that the City Actors were motivated by personal interests to sacrifice members of a group that was then unpopular—law enforcement officers, and specifically law enforcement officers alleged to have utilized excessive force against African Americans—in order to curry popular favor and advance their own personal interests. This was done while they knew that excessive force was not utilized.

If the Lower Court wished to apply the rational basis test to the facts averred in this case, that City Actors knowingly condemned innocent men, placed their lives in grave danger, and did so all while knowing no wrong had been done in an extremely public manner seemingly designed to optimize damage to Appellants, it could have attempted to apply that test:

> The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose—a goal—which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting governmental body are entirely irrelevant.... The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would

41

further the hypothesized purpose. The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

*Haves v. City of Miami,* 52 F.3d 918, 921–22 (11th Cir.1995) (internal quotations and citations omitted).

A judge—and people— could come to the conclusion that knowingly sacrificing the lives of three men to server a greater purpose, to quell rioting masses, may serve a legitimate government interest and be rational. If a violent mob is clamoring for blood and to have perceived wrongdoers condemned absent trial or process, such may certainly be considered rational for some people— placating the populace with sacrifice has been an option favored throughout history.[12] Both Shields and Bottoms allude to these exact motivations. Doc. 148-1 p. 7.

---

[12] *See, e.g.*, Katie Rose Guest Pryal, *Heller's Scapegoats*, 93 N.C. L. Rev. 1439, 1447 (2015) (quoting Joseph E. Kennedy, *Monstrous Offenders and the Search for Solidarity through Modern Punishment*, 51 Hastings L.J. 829, 833 (2000)) ("The essence of scapegoating is the attempt to identify the sources of social problems as external to the group."); *see also id.* at 1446("Thus, as James Jasinski explains, Burke saw the scapegoat as a means of purifying society of its sins, or of removing its guilt, through a process of 'externalization.'"); Paul Kahn, *Managing Violence: Acoustic Separation, Memorials, and Scapeogoats*, 77 RJUPR 317 (2008)

That said, the inquiry had to be conducted; further, the inquiry is slightly complicated in that a plaintiff may demonstrate the "legitimate" rational basis is a pretext. *See Adams ex rel. Kasper v. School Bd. of St. Johns Cnty.*, 57 F.4th 791, 810 (11th Cir. 2022) *(en banc)* (recognizing that an otherwise neutral law still violates the Equal Protection Clause when it is "motivated by 'purposeful discrimination' ") (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979)); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321–22 (11th Cir. 2021).

This complexity is somewhat heightened in that it does not appear as if the Eleventh Circuit has directly tackled the question of the interplay between the rational-basis test and a motion to dismiss. *See generally Smile Direct Club, LLC v. Lacefield*, No. 1:18-cv-02328-SDG, 2023 WL 2763662 at *7 (N.D.Ga. Mar. 31, 2023) (citing *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) ("Competing standards for resolving a plaintiff's equal protection claim under Rule 12 complicate our analysis when we review a plaintiff's claim under the rational basis standard."); *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992) ("A perplexing situation is presented when the rational basis standard meets the standard applied to a dismissal under Fed. R. Civ. P. 12(b)(6)."); *Baumgardner v. Cnty. of Cook*, 108 F. Supp. 2d 1041, 1055–56 (N.D. Ill. 2000) ("When considering the rational relationship standard in conjunction with the standard for a 12(b)(6)

43

motion to dismiss, a confusing situation is presented.")). The matter is made even less clear in that the Lower Court seems to ignore all of this.

Ultimately, Officers pleaded that the disparate treatment happened for an improper purpose, as demonstrated by Shields and Bottoms disregard of duly passed city ordinances[13], the Lower Court ignored that and determined that the purpose was proper—all of this was done without analysis and without the proper inquiry. That simply put was an abuse of discretion.

Had the Lower Court utilized a reasoned analysis (or at a minimum alerted Officers that it intended to *sua sponte* address an entirely unargued theory that would compromise the pleaded claim) it is likely that the opinion would resemble the reasoning in *Smile Direct Club, LLC*, No. 2023 WL 2763662 at *8 (denying motion to dismiss where allegations of pretextual non-discriminatory basis for action on rational-basis review). It, however, does not, and it appears the Court did

---

[13] The trial Court also concluded that Shields and Bottoms actions were within their discretionary authority by performing a legitimate job-related function, citing to *Holloman ex rel. Holloman*, 370 F.3d 1252, 1266 (11th Cir. 2004). The Court did not, however, examine the second prong of *Holloman* – whether the official was executing a job-related function *in an authorized manner,* in regard to their violation of multiple ordinances of the City of Atlanta, which clearly circumscribe their authority: "Employment by a local, county, state, or federal government is not a carte blanch invitation to push the envelope and tackle matters far beyond one's job description or achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id.* at 1267.

not apply the correct law to the facts pleaded. For this reason, reversal is appropriate.

## **<u>CONCLUSION</u>**

This Court should reverse the Lower Court's judgment, remand this matter to the Lower Court with instructions to enter an order denying Appellees' motions to dismiss, and grant all other further relief that this Court finds just and proper.

Respectfully submitted this 28th day of November, 2023.

*/s/ Lance J. LoRusso*
Lance J. LoRusso
Georgia Bar No. 458023
Attorney for Appellee

/s/*Ken Davis*
Ken Davis
Georgia Bar No. 705045
Attorney for Appellee

LoRusso Law Firm, PC.
1827 Powers Ferry Road SE
Building 8, Suite 200
Atlanta, GA 30339
770-644-2378
lance@lorussolawfirm.com
ken@lorussolawfirm.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      Pursuant to Fed. R. App. P. 32(g), I hereby certify that the foregoing document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted, this document contains 9,394 words.

2.      I further certify that the foregoing document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word in 14-point Times New Roman.

This 28th day of November, 2023.

<u>/s/ Lance J. LoRusso</u>
Lance J. LoRusso
Georgia Bar No. 458023
Attorney for Appellee

<u>/s/Ken Davis</u>
Ken Davis
Georgia Bar No. 705045
Attorney for Appellee

LoRusso Law Firm, PC.
1827 Powers Ferry Road SE
Building 8, Suite 200
Atlanta, GA 30339
770-644-2378
lance@lorussolawfirm.com
ken@lorussolawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28<u>th</u> day of November, 2023, the foregoing

Appellant Brief was electronically filed with the Clerk of Court using the

CM/ECF system, which will automatically send e-mail notification of such

filing to opposing counsel.

*/s/ Lance J. LoRusso*
Lance J. LoRusso
Georgia Bar No. 458023
Attorney for Appellee

/s/*Ken Davis*
Ken Davis
Georgia Bar No. 705045
Attorney for Appellee

LoRusso Law Firm, PC.
1827 Powers Ferry Road SE
Building 8, Suite 200
Atlanta, GA 30339
770-644-2378
lance@lorussolawfirm.com
ken@lorussolawfirm.com